Effie W. Keery v. Commissioner.
Effie W. Keery v. Commissioner
Docket No. 35109.
United States Tax Court
1953 Tax Ct. Memo LEXIS 297; 12 T.C.M. (CCH) 395; T.C.M. (RIA) 53124; April 15, 1953
*297 Isaac E. McCommon, Esq., and James D. Wolfe, Esq., 78 Main Street, Bradford, Pa., for the petitioner. Roy E. Graham, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of $3,664.19 for 1944, $1,787.08 for 1945, and $8,651.17 for 1946. The only issue for decision is the value, at the date of death of the mother of the petitioner, of a 7/16 interest in an oil and gas lease. Findings of Fact The petitioner filed her individual returns for the taxable years with the collector of internal revenue for the Twenty-third District of Pennsylvania. The petitioner's mother died on June 13, 1941 and left to the petitioner a 1/2 interest in a 7/8 oil and gas lease, known as the Rock Hill Property, in McKean County, Pennsylvania, which had been operated for many years as a partnership. Those operations had resulted in losses of $4,442.37 for 1938, $8,777.70 for 1939, and $6,604.78 for 1940. The partnership also reported a loss of more than $5,375.29 for the period January 1, 1941 through June 13, 1941. There were then on the property 40 producing wells and 8 active water intake wells. The petitioner, *298 as executrix of her mother's estate, filed a Federal estate tax return in which the 7/16 interest in the Rock Hill Property was appraised and returned at $16,000. That same amount was shown as the value at date of death and at the optional date of one year after death. That return was examined by a revenue agent who concluded, after an investigation that the value of that item was correctly reported. It was reported at the same value on the Pennsylvania inheritance tax return. The petitioner's 7/16 interest in the Rock Hill Property was sold on December 1, 1944 for $130,000, of which the petitioner received $36,400 in 1944, $16,720 in 1945 and $74,880 in 1946. The petitioner, as executrix of the estate of her mother, filed an amended Federal estate tax return in which she reported the value of the 7/16 interest in the Rock Hill Property as $77,000, and the value of another item (which had been reported in the original return as $1,442.97) as $11,000. She explained that the "interest in the Rock Hill Oil Company is based on estimated value of oil reserve and equipment as of 6/13/42, together with sale of decedent's interest in oil property 12/1/44, at price of $130,000.00" and that *299 the increase in the other item was based on a sale of decedent's interest on June 2, 1943 for $11,000. She tendered the Collector $9,052.61 as additional Federal estate tax resulting from the increases in the reported values. The Commissioner refused to reopen the matter and returned the $9,052.61 to the petitioner. The most efficient method of operating a property like the Rock Hill Property in 1941 was the "five-spot" method of forcing water under heavy pressure into the oil bearing sands through four water intake wells surrounding an oil well. There were two "five-spots" in operation on the property on June 13, 1941, both installed since 1939. Portions of the property had been dump flooded previously, an inefficient method of obtaining oil. The husband of the petitioner operated the property from the fall of 1941 until the sale in December 1944. He hired a firm of petroleum engineers who core drilled six wells and laid out a drilling and pressure flooding plan. The husband drilled a total of 16 wells on the property, 7 for oil and 9 for water intakes. The record does not show the financial results of the operation of the property by the husband. Prospects, including demand *300 and prices, were good in the Bradford Field in 1941. Prices for oil properties there were generally from one-fourth to one-third higher in 1944 than in 1941. One of the decedent's partners purchased the 1/4 interest of another in the partnership in 1940 at a price not shown by the record. The peak of secondary production in the Bradford Field was reached in 1937. Total annual production from the Rock Hill Property from 1920 through 1944 was as follows: Year
Barrels
1920
6,333.68
1921
12,637.68
1922
10,878.40
1923
13,957.36
1924
16,554.16
1925
18,393.68
1926
18,021.68
1927
15,168.32
1928
17,005.28
1929
19,962.00
1930
13,604.25
1931
11,631.50
1932
13,057.44
1933
15,865.56
1934
14,091.48
1935
9,756.19
1936
8,666.98
1937
9,313.81
1938
7,544.31
1939
8,724.68
1940
10,570.27
1941
7,108.20
1942
11,362.66
1943
19,258.98
1944
34,060.10
The annual average of crude oil prices in the Bradford Oil Field was $2,565 in 1941. The average was lower in the ten preceding years. It was $2,942 in 1942, $3 in 1943 and $3,312 in 1944. The fair market value of the petitioner's interest in the Rock Hill Property at the time she acquired *301 it was not in excess of $16,000. The petitioner reported long-term capital gains of $19,230.41 for 1944, $9,889.72 for 1945 and $39,559.70 for 1946 from the sale of her interest in the Rock Hill Property and included 50 per cent of each gain in taxable income. She used $77,000 as her basis for the property, added $9,154.26 for cost of additional equipment after June 13, 1941, deducted depreciation and depletion from the basis and deducted expenses of the sale from the sales price in computing a net gain of $68,680.05 from the sale. The Commissioner, in determining the deficiencies, held that the taxable 50 per cent of the long-term capital gain of the petitioner from the sale was $16,609.53 for 1944, $8,542.04 for 1945 and $34,168.17 for 1946. The record does not show how he computed those amounts. All facts stipulated by the parties, including all joint exhibits, are incorporated herein by this reference. Opinion MURDOCK, Judge: The parties are agreed that the petitioner's basis for the property is its fair market value on June 13, 1941. Section 113(a)(5). The Commissioner does not plead or claim estoppel. Cf. . An error *302 in valuation for estate tax purposes may be corrected. . The only issue for decision, as both agree, is the fair market value of the property on June 13, 1941. The Court must determine the value as best it can after carefully considering all of the evidence. The parties might have made that task easier, or at least strengthened their cases, by clarifying a number of matters which are bound to puzzle any thoughtful person who studies the record. However, the Court must reach a decision on the record as it has been presented. The obvious increase in the money value of the lease is perhaps explained in part by the facts that production at the time of the sale far surpassed production at June 13, 1941, oil property prices generally increased in the field from 1941 to 1944, and the United States had gone to war. The value of the property given in the original estate tax return was $16,000. The petitioner and one of her attorneys in this case signed and swore to that return. The petitioner swore that the fair market values given therein were correct to the best of her information, knowledge and belief. The attorney swore that the return *303 was a true and correct statement of the information respecting the estate tax liability of which he had any knowledge. A similar return, using the same valuation, was filed for Pennsylvania inheritance tax purposes. Neither the petitioner nor the attorney was a witness in this case. The Court must assume that they had ample and sound reasons for believing that the property was worth at least $16,000 on June 13, 1941 (cf. ; ; , affd. ; , affd. , certiorari denied ; , affd. , a value which would appear to be high in view of the consistently large losses from the operation of the property preceding that date. Those losses have not been explained except, perhaps, for an inference that operating methods might have been improved had the expensive "five-spot" method been more extensively employed. One of the decedent's partners bought another's *304 1/4 share of the 7/8 interest in 1940, but the price paid does not appear in the record. That purchaser also offered to buy the petitioner's interest for $16,000 shortly after June 13, 1941 or to sell his own equal interest to her, perhaps at that same price, but the significance of his offers is not clear in the record and is not relied upon by the Court. The petitioner relies principally upon the testimony of a witness who stated that the fair market value of the 7/16 interest on June 13, 1941 in his opinion was $79,202. The witness was a real estate broker who did a large amount of business involving oil properties in the Bradford Field. The petitioner employed him in 1945 to place a value on her 7/16 interest in the Rock Hill Property as of June 13, 1941 for Federal tax purposes. The implications of such an arrangement for a retrospective appraisal are obvious. He was examined as a witness to bring out his experience in buying, selling and appraising oil properties. He gained his knowledge of the property after being employed. He knew of no comparable sales. He explained in general how he appraises an oil property and mentioned some things he considered and others he disregarded *305 in valuing this property. He did not explain adequately how he reached his conclusion and the Court is not sufficiently informed to decide whether his method is sound or faulty. His opinion is entitled to some weight. A disinterested appraisal by approved methods, in the absence of better evidence, may be determinative or at least quite helpful. . An effort has been made to evaluate this opinion along with all of the other evidence of value in the record. The Court has concluded that the evidence as a whole does not preponderate in the petitioner's favor and does not justify a finding contrary to the determination of the Commissioner. Decision will be entered for the respondent.